Good morning, and may it please the court, my name is still Sarah Gannett and I represent this morning the appellant Dwayne Thompson. Did you say your name was still Sarah Gannett? Yes it is. Very good. I like that. With the court's permission, I would like to reserve three minutes for rebuttal. Okay. The agent's failure to promptly bring Mr. Thompson before the magistrate or secure his waiver was unnecessary and unreasonable under 18 U.S.C. 3501C and the McNabb-Mallory rule, when the reason for their delay was to convince him to cooperate. The distinction the government makes between cooperation and confession is artificial, and that's illustrated in the Supreme Court's opinion in Corley, which essentially uses the terms cooperation and confession interchangeably. Could there be a situation where there was a distinction between discussion, and I'll say discussion rather than inquisition, with someone who was going to be arrested to get them to cooperate and interrogating that individual? I don't think that there is a distinction between what happened here, which is an attempt to persuade, to convince, to pressure Mr. Thompson to cooperate. It's the McNabb-Mallory rule is designed to prevent just that kind of pressure. But if it's just to cooperate, why isn't that okay as opposed to pressuring him to confess? Well, so a confession is a logical antecedent or at least a condition of cooperation. What if we find it was just to see if he would cooperate, not to elicit a confession? I don't think you can have one without the other. If you imagine cooperation of a defendant, you can't, for instance, in a drug case like Mr. Thompson's, you can't imagine a defendant saying, I'm not a drug dealer, but let me give you some information about my supplier. What's your view? It doesn't work that way. Your view is that you have to start with a confession in order to get him to cooperate. It's at least implied. You can't give information about your involvement in a drug conspiracy without admitting that you're involved in a drug conspiracy. And so... Well, that's not true, right? I mean, you can think of situations where someone will be transferring responsibility. I didn't know what this was about, but if it is as you say, officers, this is what I know about what they're doing. That at least would give information about knowledge about the conspiracy to some degree, which implicates the dependent to some degree in that arrangement. No, but I think that Judge Fuentes' point is, can you have an instance where you don't have a coerced confession as the antecedent to cooperation? So, it may be possible. It's certainly not what happened here. Because in the course of the cooperation that occurred here, the defendant admitted to possession of kilograms of cocaine, admitted to distributing cocaine, admitted to a network in which he was involved that spanned at least four states. How long before this incident with the search of the house was the truck stop in Texas, was it? The truck stop in Texas occurred approximately, I think, a month earlier. Okay. And at what point did the district court make a finding as to the exact time that the arrest occurred? I assume it was in the house during the search. The arrest occurred at 7 o'clock in the morning. During the search? Or before the search? Prior to the search. Okay. The search began at approximately 7.15 in the morning. Okay. And the purported attempt to secure cooperation, or the attempt to secure the confession, was the purpose of the delay in this case. Because at the point at which the arrest occurred, they removed Mr. Thompson from the home. They had multiple agents present at the site of the arrest. And at what point did he stay at the house during the search? What they did is, after removing him from the home, they brought him back in. And they seated him at the table where they were collecting the evidence and cataloging the evidence. And while he sat there, for the entirety of the search, even though they had multiple agents present at that location, they played wiretaps for him to, quote, show him the strength of our case so that he would be more willing to cooperate. And then at the point at which the search was concluded, they decided to drive him to Los Angeles. During the course of the drive, they continued... I was listening. This did not occur in Philadelphia. I'm sorry. Did I say Philadelphia? No, you said they drove him to Los Angeles. They drove him to Los Angeles. This did not occur in Philadelphia. This occurred in California. They drove him to Los Angeles, an hour to an hour and a half away. And during the trip, they continued to talk to him about the case, the strength of their evidence. But there's nothing wrong with that, is there? I mean, while he's seated in his house and they're conducting searches, is there anything inherently wrong in playing wiretapes? There's nothing inherently wrong with it. The question is, they had him for a total of six and a half hours prior to the beginning of his confession. That exceeds the safe harbor that is provided in Section 3501C. At that point, once the safe harbor is exceeded, the Section 3501C requires that we look to the McNabb-Mallory rule and we analyze, was the time that was spent unnecessary or unreasonable given the availability of a magistrate and the ability of the officers to get the defendant to a magistrate? What from your view would be the soonest, that reasonable time now, the soonest that they could have taken Thompson to a magistrate? The government presented no evidence that there was any obstacle to taking him to the magistrate immediately. They had no shortage of officers. They were within striking distance of Los Angeles, at most an hour and an hour and a half away. There was a morning... Depends on traffic. Pardon? Is there a way to stay in California depending on traffic? Depending on traffic, but they testified it took them no more than an hour to an hour and a half to get there. So at 7 a.m., they had him in a car. But you have to have a magistrate available. There was a morning docket that morning. All right, so you're talking about 9 o'clock, 9, 10 o'clock? So they presented no testimony about what the time of the morning docket was. But there was testimony. Wasn't there a time beyond which you couldn't get in to see the magistrate in the morning? So the testimony was that they missed the cutoff for the morning docket. They didn't say what time the cutoff was. They didn't say what time the morning docket was. And under Valenzuela-Espinoza, which is cited in our briefing, the Ninth Circuit held that missing a cutoff is not an excuse for not getting to a magistrate. They made no effort to find out what time the morning docket was. It depends on the reason you missed the cutoff. Excuse me? It would depend on the, well, so the cutoff is just when paperwork or getting on the list of the docket would occur. And that case says that getting on a list is not an excuse for not getting before a magistrate. Missing the actual docket is a different story. But there's no evidence that that's what happened here. Nor did the agents find out when the afternoon docket was happening or whether they could get the case specially listed. More importantly, they never tried to get a waiver, which would have been the simplest way to avoid any question that we're having here today. Are you asking us to establish a rule that if law enforcement wants to engage an arrestee in cooperation discussions that they have that person sign a waiver first? The court doesn't need to establish that rule. The rule is the rule established by 3501C in the McNabb-Mallory Rule, which is that if agents exceed the six-hour safe harbor, which is a lengthy safe harbor, six hours they have to get him to court. If they exceed that time, then the court analyzes whether the time that they took was unreasonable or unnecessary. So should we be, you know, we're focusing on this six hours and 15 minutes. Should we be focusing rather on the time that it took for actual presentment? Because 15 minutes sounds like the response could be that's de minimis, but should our focus instead be on when the actual presentment was made? Well, so we, I think it's important that we don't look at six hours at all once we're beyond the safe harbor. So once the safe harbor elapses, the six hours drops out of the equation and what we're left with is the McNabb-Mallory Rule itself. And under McNabb-Mallory, it's not the length of time that matters. It's the reasons for the delay that matter. And I think it's worth noting that in McNabb, one of the defendants was only interrogated for five to six hours. And under Mallory, one of the defendants was, the defendant was interrogated for seven hours. In Corley... Do you think this was interrogation as opposed to working with the defendants? Interrogation, interrogation... To see if he wanted to... Interrogation is a bad choice of words. Make things easier for himself? Interrogation is a bad choice of words because that's not the question under McNabb-Mallory. The question is delay. And it doesn't matter if the defendant is being questioned for that entire period of time or not. And in fact, in McNabb, in Mallory, in Corley, the defendant was not interrogated for that entire period of time. And Corley is a good example. In Corley, as opposed to in this case, the defendant was simply held for three and a half hours at a police station and then taken to a hospital for three and a half hours. And then taken to the FBI where they spent some time trying to persuade him to cooperate before he eventually confessed. The sanction here would be suppression of the confession. Correct. Does that make a big difference in your case? So the government argues that there would be harmless error here. And our, let me start by saying our briefing makes an error in that we argued in the brief that the government would have to prove harmlessness beyond a reasonable doubt. That's not the standard. It's simple harmlessness because this is not a constitutional error. But the government can't even meet that harmlessness standard here because we have a conditional guilty plea. And so the question is not what the evidence might have been at trial, but whether the error here would have affected the guilty plea. And that's a very difficult standard for them to meet. That's an interesting argument. I beg your pardon, Your Honor? That's an interesting argument. I hadn't looked at it quite that way. You may well be right. That's, go ahead. And I think that's a very difficult standard for the government to meet here because the defendant entered a conditional guilty plea. We know that the statement was, and the suppression of the statement was important to him. Let's say you're right and the confession is suppressed. But my question was, how does that affect your case? There's still a lot of evidence. There's a lot of evidence that could be used. But statements are uniquely powerful evidence. And the Supreme Court has recognized the unique power of a statement, as recently as in Skilling. They're uniquely powerful to juries, but in particular, they're uniquely powerful to defendants. The idea of going to trial in a case in which your own statement is going to be used against you carries a special significance that no other piece of evidence can carry in a trial. Here the majority... Well, so you can put a couple of kilos in your toaster oven? Well, so here the majority of the evidence was from cooperators whose credibility is subject to attack. Wiretaps, the majority of which needed to be interpreted by the government, and which also involved cooperators who are subject to attack. It involved the allegation that he spent more money than he should have been able to spend given his job. It involved seizure of drugs. But the seizure of drugs was also subject to attack, based on the forensic evidence, fingerprint evidence we know is open to attack these days in light of the National Academy of Sciences report. And also, there was the issue of which of the drugs did he know about, which ones did he not know about. And so it goes to at least the issue of relative culpability. Are you thinking about the types of delay that have been permissible versus the type of delay here as sort of a dichotomy of objective, you know, timeliness, you know, we ran out of time, traffic, et cetera, versus very subjective? Well, your concern, I presume, is, you know, how one defines cooperation, which of course has been the majority of the time spent here, interrogation versus cooperation. It would seem that giving the law enforcement that much discretion could be problematic. So I seem out of time. If I could answer that question, I would have two responses. One is that the traditional exceptions to the McNabb-Mallory rule focus on the ability to get the defendant to the magistrate. So it's the time and the distance to the magistrate. It's humanitarian reasons. It's reasons that have to do with practical obstacles. Those cases, the second response is that those cases which have provided exceptions for cooperation involve instances where the defendant immediately volunteered to cooperate, not cases in which the defendant was pressured to cooperate over time as occurred here. Thank you. Thank you. Was she that good yesterday? Yeah. She was. Okay. May it please the court, my name is Michael Ivory. I'm an assistant U.S. attorney and I'm from Pittsburgh. Good morning, your honors. Good morning. The one thing that I think this court should take into account is that after Mr. Thompson was advised of his Miranda warnings, he asked the agents what the case was about. So he was the one who asked Agent Strobel, Task Force Officer Strobel, what's going on? What do you have on me? You're kidding us, right? I mean, you have 12 cops in your house with all sorts of weapons, what else would naturally come to mind? Well, I mean, Mr. Thompson was curious as to what the evidence was against him other than the kilograms. Why is that at all helpful or relevant? Because this is not a situation that you had in McNab or Mallory where the agents or the This was a situation where Mr. Thompson wanted to know what was going on and Agent Strobel did show him the strength of the government's case. That is not interrogation. That is responding to a defendant's inquiries about what kind of evidence do you have on me? So there's nothing wrong with- And then they proceeded to play the evidence while he sat there. Well, there's a question as to that. Agent Strobel testifies that he may have played it at the house or in the car en route to the DEA offices from Mr. Thompson's house. He was already under arrest at this point. Why did they go to the DEA offices at all? He's under arrest. They searched the house. Why did they go to the DEA offices? I mean, the lunge is a- forget the lunge for a second. Well, you are permitted to process a defendant. I mean, that is- But the clock is ticking. Sure, you're permitted to process him. The clock is ticking and he was also present during the search, which is permissible under Michigan v. Summers. Well, you're not saying that any of these things are impermissible. We're simply saying the clock is ticking and there comes a point, it seems to me, where if the rule means anything and if Mallory McNabb means anything, that the police officers have to have their feet held to the fire. And if they make a decision to spend time doing X, Y, or Z rather than presenting this guy to a magistrate, why shouldn't that be held against them? But there are certain practical and administrative matters that have to be taken into account. Again, this is a search warrant- this investigation was centered in Pittsburgh. The search occurred in Los Angeles. You had two officers from Pittsburgh who were involved in the search. After the impact team left, I believe there were six or seven officers or agents involved in the- Yeah, but you're not arguing that the logistics is the reason that we got to six hours and 15 minutes, right? I mean, you know, if we did the math, three, three and a half hours, right? It was, I believe, two and a half hours to search the house. Okay, I guess that's the question I'm asking you. You have more time to account for. So my question is this. It would appear that what the government would like out of this is a rule that says once an arrestee inquires about what's going on or an arrestee engages in discussions about possibly cooperating, then the presentment requirement should be set aside because that's of a different nature, so the clock shouldn't be running. No, I'm not saying that at all. In fact, those are considerations that factor into the overall reasonableness of the delay in the case. Well, there's no logistical reason similar to the ones that have been approved by other courts for the delay, right? So therefore, really the only reason for the delay was investigating or instigating or finding out whether he'd cooperate. No, that's not accurate, Your Honor. Again, it took time to search the house. Yeah, but you told me that's two and a half hours. Right. And we're at six hours and 15 minutes, so that's, you know, three hours and 45 minutes. Then there was the hour and a half it took to transport Mr. Thompson to downtown Los Angeles. There was processing at the DEA. They did miss the morning docket. Talk about the morning docket. Could you explain that? It's nine o'clock. I assume the magistrate starts business. It's LA. It's a little early. Wow. Let's hope that the Ninth Circuit doesn't listen to the recording of this argument, but I don't know what the specific times are, but because there's a morning docket and an afternoon docket in Los Angeles. But it's your case. I mean, you can tell me what time do they normally start business in this particular court because there are two sessions, right? Yes, there's an afternoon session and a morning session. You missed both sessions. When I say you, of course, I mean these agents. Right, right. But give us an idea what you're talking about. You're supposed to take a person arrested to a magistrate within six hours. And Judge Greenaway was talking about two significant events, the search and the travel. What prevented you from bringing the prisoner to a magistrate within six hours for the first session other than those two events? Agent Strobel checked and he testified that they had missed the morning docket. We don't know the time. What did you do that resulted in missing the morning docket? That's the question. It was the time expended during the search as well as the time for transport and the time for process. I did say other than that, but what prevented you then from missing the second session? Mr. Thompson began cooperating in the afternoon. What time in the afternoon? I believe at 1.30 in the afternoon, he indicated that he was willing to cooperate. Coincidentally, exactly six hours. Fifteen minutes after the six hours had expired. How many minutes? Fifteen minutes. Fifteen minutes. And this is not a case where Mr. Thompson's cooperation consisted of a confession. But what are you asking us? If it's not cooperation that you want us to focus on, then what is it? Because when we look at the other reasons, the other bases for a reasonableness analysis, they're logistical. Well, you also have to consider when Mr. Thompson actually had his initial appearance, which was 48 hours after the arrest. That was what I was concerned with addressing. Is that helpful to you? It's helpful because... Two days later? Yes, it is. Because during that time period, Mr. Thompson is proactively cooperating. He's trying to set up a deal against one of his co-equal members of the conspiracy involving a by-bust involving two kilograms of cocaine. But this is like Grandy. You're arguing basically Grandy, where the time went beyond the six hours because the person was cooperating. But there, Grandy had agreed to cooperate from the very beginning. You're saying that time was necessary to elicit this guy's cooperation. Yes. There's no problem eliciting a defendant's cooperation. Well, there isn't, but some of us may look at that... Even if it takes a couple of hours. I don't think you should penalize a defendant who, later during the course of interviewing an agent, of interacting with agents, decides to cooperate. And then, as opposed to a guy who's like, you got me, I'll do whatever you guys want me to. How are you penalizing the defendant by saying that getting one's cooperation is interrogation? Because there seems to be implied in Mr. Thompson's brief that if you don't cooperate right away, we have to take you for your initial appearance. That's not what I think happens. No, but the cases seem clear whether you cooperate right away or not. The time is running under the rule... That's correct. That's why it's a six-hour window. But in this case, Mr. Thompson... And if the agents decide to do certain things while that clock is running, that doesn't mean that they get told the six-hour clock. Well, what would have happened if we had been driving Mr. Thompson to his initial appearance for the afternoon docket, and he says, you know something, I've changed my mind. I want to go back. I do want to cooperate. I want to get a 5K. I was supposed to say... Well, presumably, you'd have him sign a waiver. Well, we'd have him sign a waiver. We wouldn't be here. He did sign a Rule 5 waiver. Is it a good waiver? I think it's a great waiver. Or is it a defective? Ms. Gannett, if I'm not mistaken, argues it's a defective waiver. There are two problems. There's... I don't think that there's a problem. Is there anything in there about the waiver being accompanied with a Miranda? He was advised of his Miranda rights... Was there anything in there about the waiver being accompanied with a Miranda warrant? There is. It says that the defendant... And was the waiver accompanied with a Miranda warrant? It says that the defendant should sign a written Miranda waiver. And was the written Miranda waiver present when he was signed? No, it was not. And the agency... Is there anything in the waiver, the presentment waiver, about the maximum penalties? No. No. And the presentment waiver was signed much later. He signed it after he had begun cooperating. That's correct. Let me ask you a point. Ms. Gannett makes actually a very interesting point. A confession, which is what she is seeking to suppress, is implicit in an agreement to cooperate. You've got to fess up before you're interested in cooperating. That's usually what happens. Well, isn't that then the purpose for holding him during that six-hour period, to have him confess? No. I tried to explain in my... This was not a case where the government's case turned on Mr. Thompson's confession. Well, you seem awfully anxious to save it. You're saying the confession is not a big deal, but you are going... In light of the other evidence in this case, it was not a big deal. That is correct. We had... Well, certainly then you appreciate the problem that we're having with this, right? Because the effect of what you're asking us to do is to lend our imprimatur to law enforcement using this six hours to elicit cooperation. And if they're unable to, within the six hours, to go past the six hours, because if our objective is cooperation, it's okay. Whether you perceive that or not, that is what you're asking us to do. The delay has to be solely for the purposes of extracting a confession. That's clear under McNab and Mallory. Where is the word solely? Where is that adverb in McNab and Mallory? I believe actually it comes from the Corley decision where they say delay to cooperate, delay to elicit a confession is the epitome of unreasonableness. Okay, but the word solely, that adverb is not used that way though, is it? I... I can do a quick search in Adobe and see if I find it. I'll bet I don't find it. But I think that's how the courts have interpreted that afterwards. I'm still trying to get my mind around... You said the processing was necessary, and I agree, but what is the magic about processing that makes it have to occur before going to magistrate? Why couldn't you, if you know that you're within... Why not take them to the magistrate and then... When a defendant is arrested by an agency, they retain, they are kept in... They're confined by that agency until their initial appearance. After their initial appearance, they are remanded to the marshal service. You're telling me that the procedure is such that... The answer to my question is, well, that's the way we do it. That's what you're telling me. The reason that you had to process him before you took him to the magistrate is because that's the way we do it. Well, I can speak to practices in the Western District of Pennsylvania, which is what does happen. They're taken to... Well, why does it have to happen that way? What is the empirical necessity? If it's security or something, then that factors into... Booking procedures are inherent to the arrest procedure. Yeah, but why does it have to happen before he goes to the magistrate? In my own little, simple, naive way, imagine a situation where a guy is in the agent's car, gets on the interstate in Los Angeles. I forget the fact that he gets to the fork in the road and... He gets to the interstate, and the agent can either go to the magistrate's office with the defendant, or can book him and then go to the magistrate's office, and the agent says, the way we do it in sunny downtown Los Angeles is we first book him, because that's our procedure. I know the six-hour clock is running. We're going to book this guy, so we go book him, and then we go to the magistrate. Why couldn't the agent just as well say, we're up against the time limit here, let's get him to the magistrate, and then we'll process him? Because they no longer have jurisdiction over that individual's person. After he is taken to the magistrate, you have the initial appearance, and he's remanded to the custody of the Marshal Service, which is different than DEA or FBI or ATF. Well, look, you don't want a lawyer involved. That's fairly obvious. It's okay to admit to that, and that's fine. But the question comes back to this. If you look at Corley, Justice Souter says that after the six hours, but when a confession comes even later than the six hours, the exclusionary rule applies, and courts have to see whether the delay was unnecessary or unreasonable. And you obviously want us to say that cooperation provides the exception to the unnecessary or unreasonable rule. And the question is, why? Cooperation, if it pans out, does benefit a defendant. I mean, I think it is reasonable to delay an initial appearance when you have a defendant who is proactively cooperating, as Mr. Thompson is in this case when he made the 11 recorded phone calls involved to set up Mr. Gregory. But you can certainly see, I get that on cooperation, but you can certainly see what's problematic about giving the discretion to deem what is and what is not cooperation. I'm not sure he does see it. Go ahead. Well, I mean, with respect, the guidelines and the federal rules both provide that it is the government that brings substantial assistance to the court's attention and can move to reduce a defendant's sentence. So, you know, there's an assessment made by us, by the U.S. Attorney's Office, and then it's presented to the court in terms of what the cooperation is. I mean, again, we're talking about a situation where the cooperation does play out appropriately. Do you know how many agents were involved in the search of the home in California? There were, absent the impact squad. The impact squad was the individuals who executed the warrant initially, did a protective sweep of the area while Mr. Thompson... The impact squad, is that the paramilitary guys with the vests and the big guns and... Yes, Your Honor. Yes, Your Honor. But given Mr. Thompson's prior involvement with firearms, How many people? There were seven agents involved. Seven agents? Seven agents. And two, only two were from Pittsburgh, five were from Los Angeles. With the SWAT team, how many were there? Pardon? With the SWAT team, how many were there? I do want to say maybe 11 or 12, but they left after. They don't stick around because... After the danger evaded. But other than having to arrest him, put him in handcuffs, and other than your desire, the travel and the search, other than that, was there anything to prevent any of those agents from taking Mr. Thompson directly to a U.S. magistrate? No, but if I could explain why a defendant's presence... I think you already have. Why an individual's presence at the scene of the search is oftentimes necessary. And the Supreme Court recognized in Michigan v. Congress... Do you videotape these searches? I believe that this was videotaped. There is... I think Mr. Thompson testified that an officer was going through the place with the videotape. Other than the time to search and other than the travel time, was there anything to prevent any of these agents, given that you had at least seven or eight agents there, from taking him directly to a U.S. magistrate? It is preferable that someone be present when a search is executed. Other than the search, was the question. Conceivably, somebody probably could, but again, there are considerations to be taken into account. You have agents from Los Angeles who are not involved in this investigation. You've got two guys from Pittsburgh who know what we're looking for, know the relative evidentiary value of materials. Sparing one to take Mr. Thompson, I mean, it could have unnecessarily prolonged the search. Thank you, Mr. Wright. Thank you, Your Honor. Thank you. Ms. Gannett, I believe. Is it Gannett or Gannett? It's Gannett, thank you, Your Honor. Your client's an ingrate, it looks like, Ms. Gannett. I beg your pardon? Your client is a total ingrate. An ingrate. Your Honor, I think that the key focus here is on, as the court said in Pena-Ontiveros, a failure by the agents that was completely avoidable and entirely within the control of the law enforcement agency. The government adverted to the purpose of the rule here being to avoid the third degree, but the case law is clear that that's not the only purpose. The other purposes include safeguarding the misuse of the law enforcement process and assuring that the defendant is advised of his rights, has an opportunity to be advised of his rights by a neutral magistrate, has an opportunity to consult with counsel. And those are things that the agents interfered with here by extending the time between his arrest and his presentment. They had options. You didn't address before, but could you address or comment on the waiver that your client signed? We commented in the briefing on potential inadequacies in the waiver, but that's not a primary thrust of our challenge. It does seem that there were some problems with the waiver, but the point is that the waiver was not presented to our client or signed by him in a timely fashion. And that's really what's important here for purposes of the rule. The agents could have had him sign that at the moment of arrest if they wanted to pursue his cooperation. They could have had him sign it at any time during the six-hour window. Under the First Circuit decision in Jacques, they could have had him sign it at the moment they realized the six-hour window was elapsing. And they simply chose not to do that. What's more, they gave no explanation for that. And that is really the biggest problem with this record, is that the agents were absolutely unable to explain why they did not take Mr. Thompson to a magistrate that morning. They, in fact, appeared not to even investigate what the opportunities were to take him before a magistrate. And the reason that they gave was not that they had administrative or law enforcement duties to pursue, but that it's their policy not to take people that they want to have cooperate before a magistrate. And they said that the reason for that is that they're concerned about making cooperation public. But there couldn't have been much more public to the other co-conspirators in this case than the fact that agents were simultaneously executing warrants in four different states that morning. And if public revelation of the cooperation was their concern, then they had a simple piece of paper that they could have asked Mr. Thompson to sign. The reason they didn't do that is they knew he wouldn't sign it, because they had not yet completed pressuring him into cooperation. Had they done that, Ms. Scanlon, had they gotten that waiver, validly signed waiver with the attached Miranda warning, before the six-hour period? He wouldn't be here today. It would be a different case. It would be a different case. Can I ask you one question on that? Yes. Let's say he signed the appropriate waiver at the time that he initiated cooperation, which was, we all know, 15 minutes afterwards. I think it was 30 minutes afterwards. 30 minutes? Okay. Would the government have a de minimis argument then? They might, under Jacques. We don't have to reach that here, but they might. Before he said a word, they might. Right, right. Thank you. Thank you.